**Jessie J. FLOYD, M.D., Plaintiff,**

v.

**James C. ANDERS, Solicitor of Richland County, Defendant.**

**Civ. A. No. 75–1481.**

United States District Court,
D. South Carolina,
Columbia Division.

Nov. 4, 1977.

Roy Lucas, Washington, D. C., and George C. Kosko, Columbia, S. C., counsel for plaintiff.

Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Deputy Atty. Gen., John L. Choate, Kenneth P. Woodington, Asst. Attys. Gen., and Kenneth L. Childs, Staff Atty., Columbia, S. C., counsel for defendant.

Before HAYNSWORTH, Chief Circuit Judge, RUSSELL, Circuit Judge, and CHAPMAN, District Judge.

HAYNSWORTH, Chief Circuit Judge:

In this action, a physician specializing in abortions sought to enjoin his prosecution in a state court on charges of committing an illegal abortion and of murder.

At the time the complaint was filed, the state prosecutor was actively seeking indictments arising out of the death of a male child twenty days after its delivery as a result of an abortion. The grand jury voted to return an indictment for murder and an indictment for performing an illegal abortion on the same afternoon that the single district judge, after a hearing, issued a temporary restraining order, but the indictments were not returned in open court until the next day.

I.

At the outset we are met with the contention by the defendant that under the doctrine of *Younger v. Harris*, 401 U.S. 7, 91 S.Ct. 746, 27 L.Ed.2d 669, we should abstain. Here, the federal complaint was filed before the indictments, and the temporary restraining order issued on the same afternoon during which the grand jury voted to return the indictments and the day before the indictments were actually returned in open court, so the literal holding of *Younger* is inapplicable. The defendant contends, however, that the principle applies since no "proceeding of substance on the merits" had taken place in the district court before the prosecution was commenced. *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223. But *see, Doran v. Salem Inn*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648. One would suppose that the actual issuance of a temporary restraining order, after a hearing, was a proceeding of substance in the district court within the meaning of *Hicks*, but we need not stand on that ground, for it clearly appears that the state prosecutor was not proceeding in good faith, in the legal sense of the well-established exception to *Younger v. Harris*.

II.

This controversy grew out of a grisly and gruesome business.

Louise, a young, pregnant woman wished an abortion because her expectancy interfered with her hopes and plans to go to college. In July 1974, she went to plaintiff's clinic where, according to the affidavit of the plaintiff's nurse, Louise told the nurse that she was in the twelfth week of her pregnancy and gave the nurse $175, the amount of the plaintiff's fee for an abortion. The nurse checked Louise's blood pressure and pulse and administered pre-operative medication. An "instrument technician," employed by the plaintiff, escorted Louise to the "procedure room." There Louise was examined by Dr. Floyd, who determined that she was in the twentieth

week of her pregnancy, not the twelfth, and that the abortion could not be accomplished by the curettement procedure which had been contemplated by the nurse.

According to the nurse's affidavit, Louise was visibly upset when told the abortion could not be accomplished in the clinic and that to accomplish it in the hospital would cost approximately $450, rather than $175, since the hospital's charges must be included. She was given a refund of $150 out of the $175 she had paid, but she did not have $450.

A week and one-half later, Louise telephoned the nurse and informed her that she had procured the necessary money, and she was given an appointment for a checkup by Dr. Floyd on August 21. Louise failed to keep that appointment, but was admitted to the hospital on September 3.

The next day, five weeks after his estimate of the fetal age from the time of conception as being twenty weeks, Dr. Floyd injected prostaglandin into Louise's uterus which later caused successive contractions and expulsion of the fetus.

The male fetus was alive at the time of delivery. Under the care of the hospital personnel, he continued to live for twenty days. This suggests that Dr. Floyd's estimate that Louise was in the twenty-fifth week of her pregnancy at the time of the abortion was accurate. Seemingly, the child was not viable in the sense that he could live indefinitely outside his mother's womb, but he did have the capacity to live for twenty days, as he did.

When an abortion occurs in the early weeks of pregnancy so that the fetus may be thought not to be alive once it was expelled from the womb or so that it dies in a moment and without a murmur, there may be little cause for revulsion. It seems quite different when an abortion is performed when the child has long since quickened and comes into the outside world with a strong heart beat and its lungs functioning. Differences are aggravated when it takes the child three weeks to die.

III.

◼ In the circumstances of this case, it may be thought that the Constitution would permit a state some measure of discretion in regulating or proscribing late-term abortions without regard to viability, which may be impossible to determine when the child is in the womb. The Supreme Court has clearly decided, however, that the state has no such discretion and that a state statute such as South Carolina's, which proscribes abortion after the twenty-fourth week of conception,[1] is unconstitutional in its application if the aborted fetus is not viable.

In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, the Supreme Court clearly stated the constitutional right of the expectant mother to terminate her pregnancy at any time up until the moment the child becomes viable. Solely in the interest of the health of the mother, it is subject to some regulation by a state during the mid trimester and the first part of the third trimester before viability as to such things as to who may perform abortions and where. Otherwise, the right of the mother to rid herself of an unwanted fetus is comparatively unfettered. That choice, said to spring from a right of privacy or of personhood or from her right to determine her own life-style, is surely one of great importance to her. It is so personal to the woman that it is said by the Supreme Court the state may not constitutionally encumber it with requirements of the consent of a husband, if there is one, or of parents, if the mother is young and unmarried. Indeed, the Supreme Court has clearly held that the state may not require a physician who has agreed to perform the abortion to consult another physician. The choice is solely that of the woman with such advice as she seeks or receives from the physician she chooses.[2]

◼ In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the Supreme

---

1. 32 S.C.Code Ann. 682, *et seq.*

2. The opinions of the Supreme Court suggest an expectation that the woman's decision

would be an informed one made after receiving from her physician advice that was both professional and paternalistic. From all that is

Court explicitly held that until a child becomes viable, the state's only interest in regulating abortions stems from its concern with the mother's health. Until that time, but after the first trimester, the state may regulate the conditions under which abortions may be performed, but only as those conditions relate to the health of the mother. Until the child is viable, the mother's constitutionally protected right to choose to terminate her pregnancy or not to do so must be allowed by the state to prevail over any interest it may have in the preservation of fetal life. Indeed, the Supreme Court declared the fetus in the womb is neither alive nor a person within the meaning of the Fourteenth Amendment. In *Planned Parenthood of Central Missouri v. Danford*, 428 U.S. 52, 64, 96 S.Ct. 2831, 2839, 49 L.Ed.2d 788, the Supreme Court explicitly said that viability of the child is a medical concept to be determined by the attending physician, and that a legislature may not place it at a "specific point in the gestation period."

■ This prosecution was begun before *Planned Parenthood*, but after *Roe v. Wade*. *Roe v. Wade* itself, however, made it clear that proscription of abortions was impermissible before the child became viable. The Court's notice of the fact that viability generally occurs around the twenty-eighth week of pregnancy, though it may occur sooner, made it clear that the Court was treating the question of viability as one of fact, thus preventing legislatures from arbitrarily fixing a particular date for viability. Viability must, under *Roe*, be determined on a fetus by fetus basis.

Thus, at the time these indictments were sought against Dr. Floyd, it should have been obvious to the prosecutor that there was no possibility of his obtaining a conviction that could have been constitutionally sustained. The difficulty was that the prosecutor had not read the opinion in *Roe v. Wade*. He had read about it in a magazine, and he had a digest of it prepared by a

first-year law student which, in several respects, was quite misleading.

We cannot fault the prosecutor for thinking that it would not be unreasonable for a state to proscribe all abortions after the twenty-fourth week following conception. Some fetuses, the Supreme Court said in *Roe v. Wade*, attain viability by that time. Whether or not a child is viable may be difficult to ascertain prior to delivery, and the twenty-fifth week approaches the twenty-eighth week when most children do become viable, if not viable earlier. Thus, we need not upbraid the prosecutor for supposing that the Constitution reasonably might leave to the states some area of discretion in proscribing abortions at a time when all fetuses are approaching viability, and when some have actually attained it.

■ The prosecutor, however, was chargeable with knowledge of what *Roe v. Wade* actually held, and he was not entitled to proceed on the basis of what he supposed the law to be without having read what the Supreme Court had said. Had he but read the opinion for the majority in *Roe v. Wade*, he would have known that the fetus in this case was not a person whose life state law could legally protect. If a state may not legislate for the protection and preservation of the life of such a fetus, it surely cannot make the surgical severance of the fetus from the womb murder under state law. But the prosecutor here sought and obtained an indictment for murder as well as an indictment for performing an illegal abortion, when that, too, was clearly foreclosed by *Roe v. Wade*.

### IV.

■ Since the prosecutor was chargeable with knowledge of what the Supreme Court had done and said in *Roe v. Wade*, his decision to proceed to seek and obtain indictments of Dr. Floyd, in the face of that knowledge, cannot have been in good faith. Even if the indictments had been returned

disclosed in the affidavits in this case, Louise received no advice from the physician until,

after the administrations of the nurse, she arrived in the "procedure room."

## 540

before the commencement of this proceeding, *see Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669, or even if the issuance of a temporary restraining order following a hearing was not regarded as a proceeding of substance in this court, *see Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223, abstention would be inappropriate and impermissible since the prosecution itself is not being pursued in good faith. *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15. Under *Younger,* abstention may be required if the state prosecution is under a statute of only questionable constitutionality, but *Younger* makes it plain that the bad faith or harassment exception is applicable when the state criminal proceeding is under a state statute which is "flagrantly and patently violative of express constitutional prohibitions * * *."[3] This was reiterated in *Kugler.* In the face of the Supreme Court's holding in *Roe v. Wade,* there was no basis for a reasonable expectation that a valid conviction of Dr. Floyd might be obtained either upon the indictment for murder or upon the indictment for performing an illegal abortion. That is enough to bring this case within the *Younger* exception.

### V.

 The South Carolina anti-abortion statute[4] also requires that the physician, before performing an abortion, consult other physicians, and there are requirements for obtaining the consent of the husband of a married woman and of the parents or guardian of a minor.[5] While not indicted for violating any such provisions, Dr. Floyd seeks a declaration of their unconstitutionality. Without such a declaration, he may be exposed to further proceedings or harassment. Thus, he is entitled to such a declaration.

The provision for physician consultation was expressly declared unconstitutional in *Doe v. Bolton,* and comparable provisions for obtaining spousal and parental or guardian consent were expressly declared unconstitutional in *Planned Parenthood.* Thus, Dr. Floyd may not be proceeded against under any of those provisions.

### VI.

With the filing of this opinion, we assume that the pending indictments will be dismissed, and that there will be no further attempt to enforce South Carolina's anti-abortion statute to the extent that it is now declared to be in violation of the Constitution of the United States. If it otherwise appears within thirty days of the filing of this opinion, an appropriate decree will be entered.

---

3. Id. at 53, 91 S.Ct. at 755.

4. S.C.Code § 32–682(c).

5. S.C.Code § 32–683(b).